### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KAITLYN WASSEL,

        Plaintiff,

    v.

THE PENNSYLVANIA STATE
UNIVERSITY,

        Defendant.

No. 4:23-CV-02071

(Chief Judge Brann)

### MEMORANDUM OPINION

**MAY 7, 2024**

## I.    BACKGROUND

In December 2023, Kaitlyn Wassel filed a two-count complaint against The Pennsylvania State University ("Penn State") for sex discrimination under Title IX, 20 U.S.C. § 1681, and a violation of the Equal Protection Clause of the Fourteenth Amendment, under 42 U.S.C. § 1983.[1] In February 2024, Penn State filed a motion to dismiss the complaint.[2] The motion is now ripe for disposition. For the reasons stated below, it is denied.

## II.    DISCUSSION

### A.    Standard of Review

Under Federal Rule of Civil Procedure 12(b)(6), courts dismiss a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be

---

[1]    Complaint, Doc. 1.
[2]    Motion to Dismiss, Doc. 8.

granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly*[3] and *Ashcroft v. Iqbal*,[4] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[5] The United States Court of Appeals for the Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief."[6]

## B.    Statement of Facts

In this case, Kaitlyn Wassel pleads that Heather Bean, her majorette coach at Penn State, subjected her to harassment because of her weight and because she was sexually assaulted. Along with specifying many instances of harassment directed at herself, Wassel sets out allegations showing that her coach harassed at least four other women on the majorette team.

---

[3]    550 U.S. 544 (2007).
[4]    556 U.S. 662 (2009).
[5]    *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).
[6]    *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

Kaitlyn Wassel attended Penn State from 2018 to 2022.[7] While attending Penn State, Wassel participated in Penn State's Blue Band majorette team as a twirler.[8] The majorettes are a team of 8-12 twirlers, who perform as a component of Penn-State's approximately 320-member "Blue Band."[9]

Heather Bean became Penn State's head majorette coach in 1994, remaining in that position until her resignation in the Fall of 2022.[10] Dr. Gregory Drane was Bean's supervisor and served as the Director of the Penn State Blue Band and Athletic Bands.[11] Wassel alleges that Drane also served an important "reporting" role under Penn State's Title IX and anti-discrimination policies.[12] As a "director," Drane was required to report "suspected prohibited behavior . . . to the Title IX Coordinator."[13] During this time, Penn State delegated Title IX and discriminatory conduct enforcement and compliance to its Office of Ethics and Compliance, Office of Sexual Misconduct and Prevention ("OSMP"), and Affirmative Action Office.[14]

---

[7] Complaint, Doc. 1 ¶4.
[8] *Id.* ¶¶4, 8.
[9] *Id.* ¶12.
[10] *Id.* ¶13.
[11] *Id.* ¶14.
[12] *Id.*
[13] *Id.* ¶121.
[14] *Id.* ¶15.

### 1.    Bean's Harassment of Wassel

"Almost immediately" after Wassel began participating in the majorettes during the Fall 2018 semester, Bean began "fat-shaming" her.[15] Bean targeted Wassel and other teammates "based upon her view that their body size did not comport with what a stereotypical woman should look like," "petite and razor-thin."[16] Bean also purposefully humiliated Wassel by forcing her to wear a uniform that was too small.[17] She refused to allow Wassel to trade uniforms with another teammate whose uniform was too big, and prohibited Wassel and other majorettes she viewed as large or heavy from having their intentionally small uniforms altered so they would fit, even though she allowed other majorettes to alter their costumes.[18] Bean prohibited Wassel from changing her uniform during her four years in the majorettes and told Wassel that she "would need to change her body to fit her uniform."[19] As a result, Wassel developed disordered eating which continued throughout her years at Penn State.[20] Wassel was reprimanded about her eating, body shape, and the fit of her uniform at "virtually every practice session."[21] This conduct continued until Wassel's last majorette event.[22]

---

[15]  *Id.* ¶21.
[16]  *Id.* ¶21, 75.
[17]  *Id.* ¶21.
[18]  *Id.*
[19]  *Id.* ¶22-23.
[20]  *Id.* ¶23.
[21]  *Id.* ¶24.
[22]  *Id.* ¶25.

Bean held herself out as a devout Christian, frequently commenting on her religious beliefs and encouraging team members to pray.[23] In the Fall of 2018, two weeks into Wassel's first semester at Penn State, Wassel was sexually assaulted by a Penn State student on campus and did not know how to report it.[24] She disclosed the assault to Bean to seek assistance, but Bean's reaction was to become enraged, berate Wassel as a "whore," and tell Wassel that the sexual assault was "against God's will" because she "was supported to wait until marriage."[25] "Bean believed that a woman, Kaitlyn, should not engage in premarital sex – no matter that it was not consensual."[26]

Despite being a Penn State mandatory reporter, Bean refused to report the assault, ordered Wassel not to report or speak of it, and threatened to tell the team that Wassel was a "whore" and a "slut."[27] Wassel later discovered that in the wake of the sexual assault, Bean told teammates to stay away from Wassel because she was a "bad person."[28] Bean's inappropriate conduct continued later on in the Fall 2018 semester when a lice infestation broke out among the twirling team.[29] Bean told Wassel that she must have caused the infestation because she was "such a

---

[23]   *Id.* ¶26.
[24]   *Id.* ¶¶27, 73
[25]   *Id.* ¶27.
[26]   *Id.* ¶75.
[27]   *Id.* ¶28.
[28]   *Id.*
[29]   *Id.* ¶29.

whore" and that the team was lucky she did not spread an STD to them.[30] Bean began calling Wassel during weekends, demanding to know what her plans were, where she was going, and who she would be with, telling Wassel that she was demanding the information because she was a "slut" and a "whore."[31]

Bean's harassment for the assault continued to escalate during Wassel's time at Penn State. From the initial disclosure of Wassel's assault to Wassel's last performance as a twirler, Bean persistently interrogated Wassel about her personal, social and sexual life, calling her in the evenings and weekends to demand highly personal and private information from her.[32] She solicited Wassel's teammates to provide highly personal information about Wassel.[33] She referred to Wassel as a "whore" and "slut" on an almost daily basis, warned and threatened Wassel and her teammates about the perceived sexual conduct, and told Wassel and her teammates that she was a "bad" person who should not be trusted.[34] She warned Wassel's teammates not to befriend her and threatened to kick them from the team if they were seen speaking to Wassel.[35] And she told Wassel that the whole team was not permitted to choose their roommates while traveling for games because she did not trust "whoring" and "slutty" Wassel to be around underclassmen.[36]

---

[30] *Id.*
[31] *Id.* ¶30.
[32] *Id.* ¶31.
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.*

During Wassel's 2019-2020 sophomore school year, a majorette ("Witness 2") initiated formal discrimination complaints against Bean with Drane, Penn State's Office of Ethics and Compliance, and the Office of Sexual Misconduct and Prevention.[37] Following these complaints, Bean warned Wassel that she had "friends" at Penn State's "Ethics office" who would tell her if anyone made a complaint.[38] Bean repeated many times throughout Wassel's college years that she would be kicked off the team or expelled if she ever reported her to the University.[39]

Bean also harassed Wassel by ostracizing her from other team members. When Bean learned that Wassel was rooming with two other majorettes, she warned them that they should not speak with Wassel outside of practice if they wanted to remain on the team.[40] Bean also arranged for team photos to be taken only when Wassel was not present.[41] She further enlisted Wassel's teammate to share Wassel's geolocation tracking data from a social media app, under the pretense that Wassel, as a "whore" and "slut," could not be trusted out of her apartment or around other team members.[42]

---

[37] *Id.* ¶32.
[38] *Id.* ¶33.
[39] *Id.*
[40] *Id.* ¶35.
[41] *Id.* ¶36.
[42] *Id.* ¶37.

Bean used this data to surveil Wassel's location, and called or texted Wassel when she learned through the app data or teammate reports that Wassel left her apartment, demanding to know "where she was, what she was doing, and who she was with."[43] Also at Bean's direction, a teammate aggressively bullied Wassel about her social life and increasingly severe mental health symptoms due to Bean's abuse.[44] When Wassel finally reported this bullying to Bean, unaware that Bean had instructed the teammate to harass her, Bean responded by referencing Wassel's sexual assault, telling Wassel that "you deserve everything that's coming to you," and that "you should think about why you deserved to be bullied and fix yourself."[45] Throughout her years at Penn State, Wassel often hid from Bean and her teammates by staying at her mother's apartment instead of her dorm room.[46]

As a result of Bean's harassment, Wassel's mental and physical health declined.[47] In March of 2021, Wassel attempted suicide after having a breakdown, requiring a multi-day hospitalization.[48] While Wassel was in the hospital, her parents confronted Bean and told her that her conduct drove Wassel to attempt suicide; Bean did not deny engaging in the conduct.[49] Wassel's parents also insisted that Bean report the conversation to her supervisor Dr. Drane and urged

---

[43] *Id.*
[44] *Id.* ¶38.
[45] *Id.* ¶39.
[46] *Id.* ¶55.
[47] *Id.* ¶40.
[48] *Id.* ¶41.
[49] *Id.* ¶42.

her not to share Wassel's condition with her teammates.[50] Within days, Bean disclosed Wassel's condition and circumstances to her teammates and characterized Wassel as being "dramatic" and a "faker."[51]

Drane advised Wassel's parents that he was aware of their conversation with Bean and told them "he was working on it," but the Wassels saw no changes several weeks later.[52] Instead, what resulted were a series of retaliatory acts.

After Wassel returned to practice, Drane called her into a meeting with him and Bean.[53] Wassel viewed this as a deliberate tactic to silence her by including Bean in the meeting.[54] Wassel still described Bean's harassment in general terms, but Drane was dismissive, asked her no questions, and told her that "everyone goes through shit."[55] Drane stripped Wassel of her role as team captain the next day and told her to "wait a week to see if [she] still wanted to be part of the organization."[56] Bean also called Wassel into a private meeting to demand that she share details of the suicide attempt with her.[57] Bean told Wassel "I didn't do anything wrong" and threatened to have Wassel expelled from the University or kicked off the team if

---

[50] *Id.* ¶43.
[51] *Id.* ¶44.
[52] *Id.* ¶45.
[53] *Id.* ¶46.
[54] *Id.*
[55] *Id.* ¶¶46-47.
[56] *Id.* ¶47.
[57] *Id.* ¶48.

she reported her.[58] Fearing this retaliation and not knowing how or who to report the harassment to, Wassel did not report Bean's threats.[59]

Wassel experienced the consequences of Bean's harassment throughout her years at Penn State. She experienced regular panic attacks, developed disordered eating and persistent sleeping problems, experienced traumatic "flashbacks," and developed a fear of reading her text messages; her symptoms became more severe throughout her four years of twirling.[60] Her mental health treatment required her to take psychotropic medications by the Summer of 2020.[61] Wassel continues to need mental health treatment and medications as a result of Bean's harassment.[62]

During her time at Penn State, Wassel had trouble focusing on her classes and learning, her grades suffered, and she was unable to finish her classes until the end of her semester in her sophomore and junior years, requiring her to defer grades and take summer classes to complete coursework.[63] Wassel also stopped attending Bean's Spring 2021 online stretching course to avoid Bean's harassment.[64]

---

[58]   *Id.*
[59]   *Id.* ¶49.
[60]   *Id.* ¶¶54, 57-60, 62.
[61]   *Id.* ¶63.
[62]   *Id.* ¶64.
[63]   *Id.* ¶61, 63.
[64]   *Id.* ¶63.

### 2.      Wassel's Complaint

In May 2022, one week after Wassel's graduation, she initiated a complaint about Bean's conduct during a meeting with Drane's assistant and a Penn State human resource representative.[65] But she received no response to the complaint by August 2022.[66] Wassel then joined the other twirling team members and alumnae who had separately initiated complaints against Bean.[67] The group voiced their complaints when meeting with a Penn State Dean on the first day of the Fall 2022 semester.[68] They participated in an investigation by the Penn State Affirmative Action Office.[69]

Following the investigation, Penn State's Associate Vice President for Affirmative Action and Human Resources Consultant issued a letter finding that the allegations regarding Bean's body-shaming, use of uniforms, and monitoring of student whereabouts to be "corroborated by several witnesses" and in violation of University policy.[70] They "recommended a re-evaluation of how costumes are purchased, assigned, and maintained in order to reduce the potential for such allegations to occur in the future, regardless of who is in the position of Coach."[71] The findings letter also recommended an:

---

[65]   *Id.* ¶65.
[66]   *Id.* ¶66.
[67]   *Id.*
[68]   *Id.*
[69]   *Id.*
[70]   *Id.* ¶68-69.
[71]   *Id.*

[A]ssessment of the reporting structure of the Majorettes' Coach within the Blue Band, as well as the nature of the contact between the Director and the Majorettes specifically, to determine a more effective way to increase oversight and to facilitate more substantive interactions between the team and the Director, to generate the level of trust needed to ensure there is a clear path for Majorettes to have conversations with him regarding any concerns about future Coaches.[72]

But because some of the interactions relating to sexual discrimination and harassment "occurred without the presence of witnesses," the report found that it could not substantiate them.[73] The report stated that it could not discipline Bean because she had already resigned.[74]

### 3.    Bean's Harassment of Other Majorettes

Wassel alleges several prior instances of harassment in detail to show that Penn State had notice of Bean and Drane's conduct.

Witness 1 ("W1"), who twirled for Penn State under Coach Bean from 2012-2017, experienced a similar pattern of harassment.[75] Bean harassed W1 based on her size and eating habits, forced her to wear a uniform that did not fit, told her that she would have to wear the uniform all of her years on the squad, and used the ill-fitting uniform to shame and berate W1.[76] Bean also perceived W1 to be promiscuous, and harassed her in similar ways, announcing to other squad

---

[72] *Id.* ¶71.
[73] *Id.* ¶70.
[74] *Id.*
[75] *Id.* ¶82.
[76] *Id.* ¶83.

members that W1 was a "whore who fucked half the football team."[77] The harassment continued throughout W1's five years on the squad, and W1 revealed Bean's abusive conduct to Drane's Assistant Director of Bands.[78]

Witness 3 ("W3"), a Penn State twirler from 2017-2021, was also harassed by Bean on the basis of her weight and forced to wear uniforms which were too small for her.[79] Bean would yell at W3 if she saw her eating and purposefully move W3 to a position where she could not be seen when team pictures were taken.[80] In the hopes of stopping Bean's harassment, W3 told Bean that she had depression and anxiety; she also disclosed that she had been sexually assaulted in high school.[81] Bean told W3 to stay away from other squad members and referred to her as a "whale" to a teammate, continuing to harass W3 on the basis of her weight during her tenure on the majorette squad.[82]

W3 had a panic attack during her junior year after Bean called W3 during class, demanding that W3 find a different uniform and report immediately to practice.[83] W3 checked into the ER shortly after this incident because of suicidal ideations.[84] After W3's mother informed Bean that W3 would not be at practice because she was admitted to the inpatient mental health unit, Bean informed Drane

---

[77] *Id.* ¶84.
[78] *Id.* ¶86.
[79] *Id.* ¶105.
[80] *Id.* ¶106.
[81] *Id.* ¶107.
[82] *Id.* ¶108-109.
[83] *Id.* ¶111.
[84] *Id.*

of this, who called W3's mother to get information about W3's condition.[85] Bean also called W3's mother "almost every day" seeking permission to meet with W3 at the hospital, but W3's mother refused.[86] Bean continued to harass W3 after she returned to practice.

Witness 4 ("W4") began participating as a Penn State twirler in 2019.[87] Although Bean attempted to keep W4 off the team due to her weight, her tryout score was too high for Bean to exclude her.[88] Bean purposefully gave W4 a short uniform and used the poorly fitting uniform to harass her; she re-enacted W4's "body giggling all over the place," commented, "I know who isn't working out," and threw extra-large breast cups at her during practice.[89] During W4's season, Bean separated the larger and smaller squad members and permitted only the smaller squad members to get measured for custom jackets.[90] When W4's small clothing did not cover her body, Bean commented "this isn't a whore house."[91]

Wassel provides the most detail about Witness 2 ("W2"), a Penn State twirler from 2016-2019 and the only witness who submitted a formal Title IX complaint about Bean's conduct. W2 was also harassed and demeaned by Bean based on her weight and size, to the point of developing an eating disorder in her

---

[85]  *Id.* ¶112.
[86]  *Id.*
[87]  *Id.* ¶114.
[88]  *Id.* ¶115.
[89]  *Id.* ¶116.
[90]  *Id.* ¶117.
[91]  *Id.* ¶118.

freshman year.[92] W2 was harassed in similar ways to Wassel: Bean used W2's teammates to spy on her; retrieved private information from W2's phone through teammates; monitored and surveilled W2's whereabouts;[93] and stalked W2 so severely that W2 began sleeping in her car and at friends' dorm rooms to stop Bean from finding her.[94]

After W2 twirled at a fundraiser, Bean and Drane kicked her off the team for violating a policy prohibiting majorettes from participating in outside events; according to Wassel, this justification was pretextual.[95] W2 submitted an online Ethics and Compliance complaint that same night about Bean, recounting the history of abuse she had been subjected to and asking for help getting back onto the team.[96] Drane and Bean reinstated W2 after her complaint, but continued harassing her.[97] Drane yelled at W2 in front of other majorettes, telling her that he knows when someone "talks to" Ethics; Bean told W2 that "[w]e don't want you on [an upcoming] trip" and stated that she would not be allowed to participate in the pregame or half time show.[98] Despite Bean's continued harassment of W2 in Drane's presence, Drane took no action and W2 became suicidal.[99]

---

92   *Id.* ¶¶87-88.
93   *Id.* ¶89.
94   *Id.*
95   *Id.* ¶90.
96   *Id.* ¶91.
97   *Id.* ¶92.
98   *Id.*
99   *Id.* ¶93.

W2 spoke with a Penn State academic advisor who helped her file a Title IX complaint with Penn State's Office of Sexual Misconduct and Prevention.[100] The complaint detailed that Bean ridiculed W2 at practices, games, and events, physically shoved her in the presence of Drane, kissed W2 on the cheek despite W2 stating that this made her uncomfortable, instructed other majorettes to hit her and "say it was from Heather [Bean]," and instructed other majorettes to go through W2's phone and belongings.[101] The complaint also states that W2 had attempted to speak to someone at the Office of Ethics and Compliance, but Drane "warned her that he knows people, and this will go nowhere."[102]

The complaint was seen by OSPM's then-Title IX Coordinator, Assistant Vice President for Student Affairs, OSPM Assistant Director, and the OSPM Director, before finally being assigned to Affirmative Action Office Title IX Coordinator Chris Harris.[103] W2 stated to Harris by email that "I would love to share more with you or at least talk because mentally I am emotionally distraught, and I'm terrified of these people;" W2 later shared her notes and journals outlining the discriminatory conduct with Harris.[104] Because W2 had still heard nothing more about the investigation later that spring, W2 transferred to finish her senior

---

[100]  *Id.* ¶95.
[101]  *Id.* ¶96-97.
[102]  *Id.* ¶98.
[103]  *Id.* ¶99.
[104]  *Id.* ¶100-101.

year.[105] Harris closed the file, noting that he had met with Bean but that "the matter does not appear to be [Title] IX-related."[106] "Dispute arising over permission to twirl at a non-sanctioned event. Alleged verbal abuse was not gender-based and was based on performance or non-performance."[107]

### 4.    The OCR Letter

In March 2020, the United States Department of Education's Office of Civil Rights ("OCR") delivered a letter detailing the results of its investigation to the University's president.[108] According to the OCR Letter, Penn State's Title IX policies and procedures:

> failed to provide adequate notice to students and employees of the procedures, including where complaints may be filed; to ensure adequate, reliable, and impartial investigation of complaints; to provide procedures for complaints alleging discrimination based on sex carried out by employees and third parties; to provide designated and reasonably prompt timeframes for the major stages of the complaint process; and to provide notice of the outcome of complaints to the parties."[109]

The OCR Letter also concluded that Penn State "failed to respond promptly and equitably to complaints of sexual harassment."[110]

---

[105] *Id.* ¶102.
[106] *Id.* ¶103.
[107] *Id.*
[108] *Id.* ¶125.
[109] *Id.*
[110] *Id.* ¶127.

## III.   ANALYSIS

### A.   Title IX.

The federal government provides schools across the United States with funding. As a condition of receiving federal funds, Title IX of the Civil Rights Act of 1964 requires funding recipients not to discriminate against any person based on sex.[111] This prohibition can be enforced by private victims through suits for money damages.[112] To plead a Title IX claim based upon a hostile educational environment endured as a result of sex-based harassment, a plaintiff must allege (1) that she suffered severe or pervasive harassment[113] (2) based on sex, (3) that the educational institution received federal funds, (4) that an appropriate person at the educational institution had actual notice of sex-based harassment, and (5) that it responded with deliberate indifference.[114]

Penn State's briefings do not contest that it is a federal funding recipient,[115] or that Bean's harassment was "severe or pervasive."[116] Penn State also concedes

---

[111] 20 U.S.C. § 1681.

[112] *Cannon v. Univ. of Chicago*, 441 U.S. 677, 688-89 (1979); *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 76 (1992).

[113] *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 205 (3d Cir. 2001) (borrowing Title VII's "hostile environment" harassment standard to apply in the Title IX context); *see also Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993).

[114] *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284-91 (1998) (setting out elements of Title IX's private right of action in teacher-on-student harassment case and concluding that it is available against federal funding recipients for sex-based harassment only where an appropriate person at the educational institution has actual notice of harassment but responds with deliberate indifference).

[115] *See also* Complaint, Doc. 1 ¶5.

that it had actual notice of Wassel's harassment following her post-graduation complaint.[117] Instead, it argues that Bean's harassment was not "based on sex," that Bean's harassment was not so severe or pervasive that it deprived Wassel of educational benefits, and that Penn State's response to its notice of Wassel's harassment was not deliberately indifferent.

### 1.    Harassment Based on Sex

#### a.    Law

Penn State first argues that Wassel has not alleged any harassment based on sex, only sex-stereotypes.[118] Its argument seems to hinge on the notion that "sex" and "sex stereotypes" are categorically distinct.[119] This is wrong. Harassment based on noncompliance with sex stereotypes *is* harassment based on sex, and no

---

[116] *See* Reply Brief, Doc. 14 at 8. To the extent that Penn State does dispute this element, the Court finds that Wassel's thorough pleadings are more than sufficient to show severe and pervasive harassment. *See Moss v. Pa. State Univ.*, No. 4:22-CV-00529, 2023 U.S. Dist. LEXIS 140979, at *17-19 (M.D. Pa. Aug. 11, 2023) (explaining that "near-daily sex-based mistreatment" demonstrated severity of coach-on-student harassment); *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 653 (1999) (explaining that "[t]he relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits").

[117] Reply Brief, Doc. 14 at 9-10. As discussed below, however, that is not the actual notice relevant to this motion. Rather, it is plausible that Penn State had actual notice of Bean's harassment upon W2's complaint.

[118] Brief in Support, Doc. 10 at 9-13; Reply Brief, Doc. 14 at 2-7.

[119] *See* Reply Brief, Doc. 14 at 5 ("*Price* informs us that sex stereotypes are not sufficient alone to establish a claim under Title IX. *Price*, 490 U.S. at 251. As Wassel relies solely on Bean's alleged views about gender stereotypes – without a complementary gender-motivated adverse action – her Title IX claim fails.").

additional showing is required that the harasser harbored animus against women because they are women.[120]

Penn State erroneously asserts that to plead sex-stereotype-based discrimination, "Wassel must adequately plead that her gender *and* 'societal stereotypes of how [women] ought to appear' motivated an adverse decision made by the University."[121] Penn State attempts to support this argument by misstating the law with out-of-context quotes from *Price Waterhouse v. Hopkins*[122] and *Bibby v. Phila. Coca Cola Bottling Co.*[123]

By way of example, Penn State quotes the following language from the plurality opinion in *Price Waterhouse*: "In saying that gender played a motivating part in an employment decision, we mean that, if we asked the employer at the moment of the decision what its reasons were and if we received a truthful response, one of those reasons would be that the applicant or employee was a woman."[124] But Penn State omits the next sentence, which states: "In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of

---

[120] *See, e.g.*, *U.S. Equal Emp. Opportunity Comm'n v. Scott Med. Health Ctr., P.C.*, 217 F.Supp. 3d 834, 841 (W.D. Pa. 2016) ("Forcing an employee to fit into a gendered expectation . . . constitutes sex stereotyping and, under *Price Waterhouse*, violates Title VII").
[121] Reply Brief, Doc. 14 at 4.
[122] 490 U.S. 228 (1989).
[123] 260 F.3d 257 (3d Cir. 2001).
[124] *Id.* at 3 (citing *Price Waterhouse*, 490 U.S. at 250 (plurality opinion)).

gender."[125] Upon review, the rest of Penn State's arguments are based on similar misrepresentations.[126]

Neither *Price Waterhouse* nor *Bibby* disputes the basic principle of antidiscrimination law that discrimination based on noncompliance with sex stereotypes *is* discrimination based on sex.[127] The Supreme Court's decision in *Bostock v. Clayton County* removes any remaining doubt.[128] In *Bostock*, the Supreme Court clarified in the Title VII context that "[i]t's irrelevant what an employer might call its discriminatory practice, how others might label it, or what

---

[125] *Price Waterhouse*, 490 U.S. at 240.

[126] Penn State provides a quotation from *Price Waterhouse* correctly stating that a *remark* referencing a sex stereotype does not show that an adverse decision was made based on sex. *See* Reply Brief, Doc. 14 at 4-5 (citing *Price Waterhouse* at 490 U.S. at 251) ("Remarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision."). But the same is true for a remark disparaging sex directly. The focus is on the "remark," not the "stereotype;" the remark is only circumstantial evidence that subsequent conduct was motivated by sex-based animus. *See, e.g.*, *Doe v. C.A.R.S.*, 527 F.3d 358 (3d Cir. 2008). Likewise, the full context of Penn State's quotation from *Bibby* undermines the proposition it is quoted to support. *Compare* Reply Brief, Doc. 14 at 4 ("Wassel must adequately appear that her gender *and* 'societal stereotypes of how [women] ought to appear' motivated an adverse decision made by the University.") (quoting *Bibby*, 260 F.3d at 264 (3d Cir. 2001)) *with Bibby*, 260 F.3d at 264 ("[Bibby] did not claim that he was harassed because he failed to comply with societal stereotypes of how men ought to appear or behave *or* that as a man he was treated differently than female co-workers. His claim was, pure and simple, that he was discriminated against because of his sexual orientation.") (emphasis added).

[127] *See Price Waterhouse*, 490 U.S. at 251 (plurality opinion) (quoting *Los Angeles Dep't of Water and Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978) (thereinafter quoting *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194, 1198 (7th Cir. 1971)). ("As for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for '"in forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes."'"); *Bibby*, 260 F.3d at 264 ("[A] plaintiff alleging same-sex sexual harassment might demonstrate that the harassment amounted to discrimination because of sex" by showing that "the harasser was acting to punish the victim's noncompliance with gender stereotypes.").

[128] 140 S.Ct. 1731 (2020).

else might motivate it."[129] Title VII and Title IX's "'because of' test incorporates the "'simple'" and 'traditional' standard of but-for causation."[130]

Therefore, the *Bostock* court concluded that discrimination based on sexual orientation is discrimination based on sex because "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex;" the employer must know the employee's sex in order to decide whether it will tolerate her behavior.[131] Likewise, in order to harass a student for her non-conformity to expectations about how women should behave, the harasser must know the student's sex. But for a female student's sex, a harasser cannot punish her failure to comply with gender stereotypes associated with that sex.

### b.    Application

As harassment based on noncompliance with sex stereotypes is harassment based on sex, Bean's harassment plausibly violates Title IX if it is plausible that harassment based on Wassel's perceived promiscuity and weight is based on Wassel's non-compliance with sex stereotypes.

Neither party disputes that Bean's harassment was motivated by Wassel's weight and her disclosure of the sexual assault. This inference is plausible because

---

129 *Id.* at 1744.
130 *Id.* at 1739 (quoting *Univ. of Tex. Southwestern Medical Ctr. v. Nassar*, 570 U.S. 338, 346 (2013)).
131 *Id.* at 1741.

the complaint specifies that Bean's remarks about Wassel's weight and sexual assault were made contemporaneously with, and were themselves part of, her conduct of harassment. According to the complaint, Bean directly admitted to Wassel that she was harassing Wassel because she believed that Wassel was a "slut" and a "whore" and weighed too much.

First, after Wassel was sexually assaulted, Bean began harassing her and calling her a "slut" and a "whore." Penn State argues that these are not "sex-based comments," and that Bean "would have had the same reaction if a male had disclosed premarital sex" because Bean's views on premarital sex are religiously motivated.[132] But even if Bean's harassment was partially motivated by her religion, Penn State's motion fails because it is plausible that sex was at least a but-for cause of this harassment.

The terms "slut" and "whore" usually refer to women.[133] Though these derogatory terms themselves "do[] not mention gender, language which is facially neutral in semantic content can become suggestive of animus based on [its] historical connotation."[134] It is obvious that such terms' usage is misogynistic,

---

[132] Brief in Support, Doc. 10 at 13 n.8.

[133] *Slut*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/slut (last visited Apr. 18, 2024) ("a promiscuous person: someone who has many sexual partners, usually used of a woman"); *Whore*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/whore (last visited Apr. 18, 2024) ("a promiscuous or immoral woman").

[134] *Brooks v. State Coll. Area Sch. Dist.*, No. 4:22-CV-01335, 2023 U.S. Dist. LEXIS 225112, at *35 n. 197 (M.D. Pa. Dec. 18, 2023); *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006)

based on sex stereotypes which are more critical of female promiscuity than male promiscuity.[135] So Bean calling Wassel "slut" and "whore" following her sexual assault plausibly evidences that the harassment connected to these comments was sex-based.[136]

It is also plausible that Bean's weight-based harassment was motivated by Wassel's noncompliance with a sex-stereotype-based view of what a proper woman should look like. Bean excluded women who weighed more from photographs, forced them to wear uniforms that were too small to shame them for their weights, "compar[ed] [Wassel] to the smallest team members who she held out as the models of what females should look like,"[137] and, in contrast, complimented short and thin majorettes on their physiques. Wassel alleges that Bean harassed her because she "felt that women should be petite and razor-thin," and therefore viewed Wassel to be insufficiently feminine based on her physical appearance.[138] This is plausibly connected to a sex-stereotype-based view that

---

(per curiam); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1117 (9th Cir. 2004); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996).

[135] *See M.S. v. Susquehanna*, 43 F.Supp. 3d 412, 429 (M.D. Pa. 2014) (plaintiff alleged severe and pervasive sex-based harassment because "fellow students repeatedly called her sex and gender-based derogatory names like 'whore' and 'home-wrecker'"), *aff'd*, 969 F.3d 120 (3d Cir. 2020); *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014) ("gendered words like bitch and whore . . . can be strong evidence that the harassment at issue is on the basis of sex").

[136] *See Doe v. East Haven Bd. of Ed.*, 200 F.App'x 46 (2d Cir. 2006) (when a woman who was raped off-campus endured daily verbal harassment for five weeks following the rape, including being called a "slut," "liar," "bitch," and "whore," this supported a Title IX harassment claim").

[137] Doc. 1 ¶24.

[138] Complaint, Doc. 1 ¶75, 117.

24

women should be thin and short, and which judges women more harshly than men based on their physical appearances.[139]

The gendered context of the twirling team, composed only of women, lends to the plausibility of the claim that Bean's views of a proper majorette may also have been informed by sex stereotypes. Likewise, Bean's weight-based harassment cannot be viewed outside the context of her promiscuity-based harassment; the overall context of Bean's conduct reinforces the plausibility of Wassel's claim that her weight-based harassment was similarly based on noncompliance with sex stereotypes.[140]

Penn State is welcome, inadvisable as it may be, to argue to a jury that Bean was acting in a gender-neutral manner when she harassed Wassel as a "slut" and a "whore" for being sexually assaulted and demeaned Wassel for not being "petite and razor-thin." But this all depends on what develops through discovery. At the

---

[139] *See, e.g.*, Deborah L. Rhode, *Appearance as a Feminist Issue*, 69 SMU L. REV. 697, 702-704 (2016) ("About 60 percent of overweight women report experiences of employment discrimination . . . Overweight women are judged more harshly than overweight men.").

[140] *See Harrington v. City of Attleboro*, Case No. 15-cv-12769-DJC, 2018 U.S. Dist. LEXIS 7828, at *18-19 (D. Mass. Jan. 17, 2018) (explaining that student-on-student bullying related to plaintiff's weight "cannot be viewed outside the context that same of the same tormenters interspersed calling her 'ugly and stupid and fat' with calling her 'dyke' or 'fag.'"). *Cf. Owens v. La. State Univ.*, No. 21-242-WBV-SDJ, 2023 U.S. Dist. LEXIS 231150, at *17-18 (M.D. La. Dec. 31, 2023) (explaining that "[r]ude, even inconsiderate comments about a person's weight and looks do not, *standing alone*, constitute sexual harassment") (emphasis added). *Owens* arose at summary judgment and its finding that comments referring to the plaintiff as "fat" and "pig" were not sex-based depended upon the surrounding context those comments were made in. The course of harassment was otherwise unrelated to the plaintiff's weight. The *Owens* court also noted that this "teasing" involved students rather than teachers. *Id.* at *17 n.93. To the extent that *Owens* held that weight-based harassment can never be based on sex-stereotypes as a matter of law, this Court is not persuaded.

pleadings stage, Penn State does not present such an "obvious alternative explanation"[141] of the allegations in Wassel's complaint that it renders her sex-stereotype-based explanation implausible.[142] In sum, it is plausible that Bean's expectations on what a majorette should look like were informed by impermissible sex-stereotyped expectations of what a woman should look like, and that Wassel's noncompliance with these sex-stereotype-influenced expectations motivated Bean's harassment.[143]

### 2. Denial of Educational Benefits

Citing solely to cases involving student-on-student harassment, Penn State argues that Wassel failed to plausibly allege that Bean's harassment was so severe and pervasive that it caused the denial of educational benefits.[144] While plaintiffs pleading "hostile environment harassment" claims must allege facts showing that

---

[141] *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567).

[142] Courts around the country have applied a modified standard for gendered dress codes and grooming standards, upholding them so long as the burdens on both sexes are comparable and evenly enforced. *See Mother v. Rockey Mt. Classical Acad.*, No. 1:19-cv-03530-DDD-NYW, 2022 U.S. Dist. LEXIS 199166, at *16-17 (D. Colo. Sep. 30, 2022). But height and weight are distinct from dress codes.

[143] Penn State argues that Bean's views were sex-neutral because they applied only to majorettes (who were all women) and Bean did not plausibly "believe her standards or expectations should be applied to *all* women." Reply Brief, Doc. 14 at 6. Both arguments miss the point that so long as Bean applied her sex stereotypes to *some* women, she is discriminating based on sex. *See Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971) (company's refusal to hire women with young children violated Title VII even though it did not refuse to hire other kinds of women).

[144] *See Davis*, 526 U.S. at 652; *Roe v. Pa. State Univ.*, Civil Action No. 18-2142, 2019 U.S. Dist. LEXIS 24870, at *15-16 (E.D. Pa. Feb. 15, 2019); *Hawkins v. Sarasota Cnty. Sch. Bd.*, 322 F.3d 1279, 1288 (11th Cir. 2003).

the harassment is severe or pervasive,[145] the Supreme Court's holding in *Davis v. Monroe County Board of Education* requiring harassment to result in the denial of educational benefits only explicitly applied to student-on-student harassment, not teacher-on-student harassment.[146] While Courts of Appeals are divided on whether *Davis* applies to teacher-on-student harassment,[147] decisions from the Third Circuit at least imply that it does not.[148] But because both parties apply *Davis* in their briefings and because Wassel still prevails,[149] the Court will apply that same test for purposes of this motion.[150]

To determine whether sexual harassment deprived a student of educational benefits under Title IX, "courts consider whether the harassment 'had a concrete, negative effect' on the plaintiff's 'ability to receive an education.'"[151] "Examples of such negative effects include a drop in grades, missing school, being forced to

---

[145] This follows from the fact that Title IX "hostile environment" harassment claims are derived from Title VII. *See Saxe*, 240 F.3d at 205.

[146] 526 U.S. at 652.

[147] *Compare Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 695 (4th Cir. 2007) *and Escue v. N. Ok. Coll.*, 450 F.3d 1146, 1152 (10th Cir. 2006) *with Wamer v. Univ. of Toledo*, 27 F.4th 461, 468-69 (6th Cir. 2022), *Sauls v. Pierce Cnty. Sch. Dist.*, 399 F.3d 1279, 1284 (11th Cir. 2005), *and Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1, 11 (1st Cir. 2020).

[148] *See Saxe*, 240 F.3d at 205-206 (Alito, J.); *Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 360-61 (3d Cir. 2005); *Bernard v. E. Stroudsburg Univ.*, 700 F.App'x 159, 163 (3d Cir. 2017); *C.K. v. Wrye*, 751 F.App'x 179, 183 (3d Cir. 2018); *see also N.N. v. N. Burlington Cnty. Regional Sch. Dist.*, Civil No. 23-1280 (RMB/EAP), 2023 U.S. Dist. LEXIS 230761, at *14 n.3 (D.N.J. Dec. 29, 2023) (Pascal, M.J.).

[149] Brief in Support, Doc. 10 at 14-16; Brief in Opposition, Doc. 13 at 28-29; Reply Brief, Doc. 14 at 7-8.

[150] *See Lesende v. Borrero*, 752 F.3d 324, 337 (3d Cir. 2014).

[151] *Nunguesser v. Columbia Univ.*, 244 F.Supp.3d 345, 367 (S.D.N.Y. 2017).

transfer schools, or mental health issues requiring therapy or medication."[152] The fact that Wassel graduated on time certainly weakens her case, but it does not defeat it.[153]

Here, Wassel alleges mental health issues culminating in a suicide attempt requiring mental health treatment, medication, and inpatient hospitalization. And she alleges that her ability to complete coursework was so impacted by Bean's harassment that her grades dropped, and she was forced to extend schooling into the summers to complete coursework.[154] Wassel also alleges that she stopped attending a class taught by Bean because it was used as a venue to "bully and harass her."[155] This is beyond sufficient to plausibly allege a deprivation of educational benefits.

---

[152] *Id.* at 368.

[153] *See Hall v. Millersville Univ.*, 22 F.4th 397, 412 n.5 (3d Cir. 2022) (explaining that the fact that a plaintiff returned to college for her second semester "does not establish that Millersville has demonstrated that no issues of material fact exist as to the severity of [her] harassment. At most, it is more evidence to be weighed by the jury.").

[154] Penn State cites to a district court decision in which missing class for a week failed to support the denial of educational benefits. *See* Brief in Support, Doc. 10 at 14 (citing *Roe*, 2019 U.S. Dist. LEXIS 24870, at *24-25. Yet subsequent Third Circuit precedent found that the same allegation presented an issue of fact at summary judgment. *See Hall*, 22 F.4th at 401, 412 (missing class for one week following sexual assault "at minimum" created genuine dispute of fact as to whether plaintiff was deprived of educational benefits). In any case, Wassel's allegations that her studies were so impeded that she was required to extend coursework into the summers prevail even under *Roe*. *See Roe*, 2019 U.S. Dist. LEXIS 24870, at *24-25 (explaining that missing one week of class was only insufficient to show a deprivation of educational benefits because the plaintiff "does not plead that her absence interrupted her ability to learn the course material or that it affected her grades in any way," and thus plaintiff failed to plead a "'*systemic* effect of denying the victim equal access") (quoting *Davis*, 526 U.S. at 652)).

[155] *See Moss*, 2023 U.S. Dist. LEXIS 140979, at *21 (quoting *Wamer*, 27 F.4th at 471) ("[A] plaintiff can state a post-harassment claim by plausibly alleging that she was deprived of education[al] benefits available to other students because she 'experienced . . . an objectively

### 3.      Actual Knowledge

For an institution to be civilly liable under Title IX, it must have actual notice of known acts of discrimination. An institution has actual notice when an "appropriate person," an individual with authority to take corrective action, becomes personally aware of discriminatory conduct.[156]

Penn State assumes for the sake of this motion that it had actual notice "of Wassel's harassment,"[157] but this misses the point. As this Court clarified in *Moss v. Pennsylvania State University*, "it's clear that the proper inquiry is whether the institution had notice of a danger posed to the general student body" by the harasser.[158] Regardless of when Penn State knew that Wassel herself was harassed, the complaint plausibly alleges that Penn State knew of the sex-based harassment Bean subjected other majorettes to before much of Wassel's own harassment occurred.

If Bean and Drane's retaliatory threats are assumed to be true, then at least some officials in Penn State's "Ethics" offices may have also known of Bean's sex-based harassment. Moreover, as early as Wassel's sophomore year, Penn State had actual notice about Bean's conduct because another majorette, W2, complained about similar circumstances of sex harassment by Bean. Wassel pleads

---

reasonable fear of further harassment' that causes her 'to take specific reasonable actions to avoid harassment' following the institution's unreasonable response.").

[156] *Gebser*, 524 U.S. at 285.
[157] *See* Reply Brief, Doc. 14 at 9-10.
[158] 2023 U.S. Dist. LEXIS 140979, at *12.

the details of W2's complaint with intricate detail and describes how W2's Title IX Complaint was seen by OSPM's then-Title IX Coordinator, Assistant Director, and Director, Penn State's Assistant Vice President for Student Affairs, and Affirmative Action Office Title IX Coordinator Chris Harris. Wassel also pleads that OSPM was one of three offices delegated Title IX enforcement responsibilities, meaning that at the very least OSPM's director, who was on notice of W2's Title IX complaint, is an appropriate person under Title IX.

### 4.    Deliberate Indifference

Once an appropriate person has actual notice, an institution can be held civilly liable under Title IX for further discriminatory conduct to which it responds with deliberate indifference.[159] An institution acts with deliberate indifference when its response to the discriminatory conduct is "clearly unreasonable in light of the known circumstances."[160]

To show how its response was not clearly unreasonable, Penn State focuses on the actions it took after Wassel joined together with other majorettes, post-graduation, to present their complaints against Bean to Penn State's Dean.[161] But this confuses "pre" and "post" harassment claims; the former is available where an educational institution's failure to respond to known acts of harassment causes

---

[159]  *Gebser*, 524 U.S. at 290.
[160]  *Davis*, 526 U.S. at 649.
[161]  Brief in Support, Doc. 10 at 16-18; Reply Brief, Doc. 14 at 10 (explaining that "the University was not deliberately indifferent to *Wassel's allegations*").

future incidents to occur, while the latter is available where an educational institution inadequately remedies an incident after learning of it.[162] The actual notice analysis situates the deliberate indifference analysis, and Wassel alleged Penn State's actual knowledge of Bean's sex-based harassment before her post-graduation complaint. The controlling question is therefore whether Penn State's response to its actual knowledge of Bean's sex-based harassment of W2 and other majorettes was deliberately indifferent.

The deliberate indifference analysis is then straightforward. Penn State's only word on the issue is to point out that Chris Harris, the Title IX Coordinator who reviewed W2's complaint about Bean, concluded that W2's allegations were not Title IX-related.[163] This supposedly proves that "the University took [W2's] concerns seriously and sought to address those concerns."[164] Penn State's contention would mean that a University can never be liable under Title IX so long as it concludes that every Title IX complaint is not Title IX-related.

An educational institution "acts with deliberate indifference when it downplays students' reports of sexual harassment, such as by categorizing reported

---

[162] *See Doe v. N. Penn. Sch. Dist.*, 636 F.Supp. 3d 519, 527-28, 530 (E.D. Pa. 2022) (separately analyzing "post-assault" and "pre-assault" Title IX claims).
[163] Brief in Opposition, Doc. 10 at 18 n.10.
[164] *Id.*

sexual harassment as less serious misconduct."[165] Title IX's protection from sex discrimination in education requires more than a rubber stamp.[166]

The complaint's allegations that Penn State took no further action to stop Bean's sex-based harassment after Harris spoke with W2 and Bean plausibly demonstrates Penn State's deliberate indifference.[167] "Where the 'gravity of risk' of future sexual harassment is readily 'apparent,' it is clearly unreasonable for a[n] [educational institution] not to put significant safeguards in place to prevent future abuse."[168] Penn State's corrective action after Wassel and the other majorettes had graduated and brought their complaint is irrelevant to that question.[169]

Discovery may reveal that this decision was a reasonable response to the Title IX investigation into Bean's harassment. Or, discovery may favor Wassel and reveal that Penn State had actual knowledge of the harassment suffered by W1, W3, W4, or other majorettes, and yet failed to take corrective action. Either way,

---

[165] *N. Penn. Sch. Dist.*, 636 F.Supp.3d at 531.

[166] *See Doe v. Pennridge Sch. Dist.*, 413 F.Supp.3d 393, 411 (E.D. Pa. 2019) (a school may not employ "a shadow procedure that fail[s] to adequately categorize student complaints").

[167] *See K.E. v. Dover Area Sch. Dist.*, No. 1:15-CV-1634, 2017 U.S. Dist. LEXIS 163489, at *21 (M.D. Pa. Sep. 29, 2017) ("An official decision not to remedy any type of discrimination demonstrates deliberate indifference.") (citing *Bostic*, 418 F.3d at 360)); *see also Hall*, 22 F.4th at 411 ("[T]he record reveals Millersville did not reach out to [plaintiff] after the October 4th incident [reporting abuse], and that it did not take any action in response to [her roommate's] calls other than to tell her nothing could be done without a complaining witness. Certainly, Millersville's inaction in response to these reports raises a genuine issue of fact best left for a jury.").

[168] *N. Penn. Sch. Dist.*, 636 F.Supp. at 531 (citing *Does v. Se. Delco Sch. Dist.*, 272 F.Supp.3d 656, 663, 689-90 (E.D. Pa. 2017)).

[169] *See, e.g., id.* at 411 ("A reasonable jury could still conclude Millersville acted with deliberate indifference due to its inaction in response to [plaintiff's RA's] subsequent incident report [regarding plaintiff's abuse] or [plaintiff's roommate's] calls, as well as its failure to generate a police report regarding [plaintiff's abuser] until after [plaintiff's] death.").

dismissing Wassel's complaint on this basis would be premature because her allegations plausibly support Penn State's deliberate indifference to Bean's harassment. Accordingly, Penn State's motion to dismiss Wassel's Title IX claim is denied.

### B.    Section 1983 Claim

Title 42 U.S.C. § 1983 provides a private cause of action to sue for damages when a person violates a plaintiff's constitutional rights under color of state law. A municipal body is a "person" which can be liable under Section 1983,[170] and a public university is considered a municipal body.[171] Municipalities are only liable for their own acts, not the acts of their employees. A section 1983 claim against a municipality must show (1) an underlying constitutional violation (2) caused by the municipality's execution of municipal policy, custom or training,[172] (3) causing the constitutional harm.[173]

### 1.    Equal Protection Violation

The Equal Protection Clause to the United States Constitution prohibits "any State" from "deny[ing] to any person within its jurisdiction the equal protection of the laws."[174] "The Equal Protection Clause proscribes sex-based discrimination."[175]

---

[170]  *Monell v. New York Dep't of Social Servs.*, 436 U.S. 658, 690 (1978).

[171]  *Am. Future Sys., Inc. v. Pa. State Univ.*, 752 F.2d 854, 861 n.24 (3d Cir. 1984).

[172]  *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003)

[173]  *Canton v. Harris*, 489 U.S. 378, 385 (1989).

[174]  U.S. Const. amend. xiv.

[175]  *Starnes v. Butler Cnty. Court of Common Pleas*, 971 F.3d 416, 426 (3d Cir. 2020).

"[T]o prove sexual discrimination, a plaintiff must show that any disparate treatment was based upon her gender."[176]

As Wassel has plausibly alleged a Title IX hostile environment claim, she has also plausibly alleged a violation of her constitutional rights under the Equal Protection Clause. For discrimination purposes, a Section 1983 Equal Protection claim has the same elements as a Title VII claim.[177] And a Title VII hostile environment discrimination claim has the same elements as a Title IX hostile environment discrimination claim.[178] So because the Equal Protection Clause applies equally to discrimination in the workplace[179] and at school,[180] and because the elements of a Title IX hostile environment discrimination claim are the same as those of a Section 1983 Equal Protection claim, pleading a Title IX hostile environment discrimination claim also pleads a Section 1983 Equal Protection claim.[181] Therefore, if Wassel can show that Penn State caused this harassment, she

---

[176] *Andrews v. Phila.*, 895 F.2d 1469, 1478 (3d Cir. 1990). One difference between Title IX and the Equal Protection Clause is that the Fourteenth Amendment "authorizes sex discrimination that 'serve[s] important governmental objectives and [is] substantially related to achievement of those objectives, [while] Title IX prohibits all discrimination based on sex, irrespective of justification." *Mother*, 2022 U.S. Dist. LEXIS 199166, at *13 (citing *Craig v. Boren*, 429 U.S. 190, 197 (1976)). But that distinction is immaterial here.

[177] *Starnes*, 971 F.3d at 426; *Lewis v. Univ. of Pittsburgh*, 725 F.2d 910, 915 n.5 (3d Cir. 1983).

[178] *Saxe*, 240 F.3d at 205.

[179] *Starnes*, 971 F.3d at 426-27.

[180] *N. Penn. Sch. Dist.*, 636 F.Supp. 3d at 533 ("sex-based discrimination at school . . . violates Equal Protection"); *see also Fitzgerald Barnstable Sch. Comm.*, 555 U.S. 246 (2009) (holding that a student may sue for sex discrimination at school under both Title IX and the Equal Protection clause through Section 1983).

[181] This logic does not extend to Title IX elements which do not overlap with Title VII claims, such as requiring harassment to cause the denial of educational benefits.

has adequately alleged her Equal Protection claim under *Monell v. New York Department of Social Services*.

### 2.    Municipal Liability

Municipalities act through a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."[182] Penn State argues that the "failure" to train or supervise is not a "policy,"[183] and so appears to be under the misapprehension that pleading "an official proclamation, policy, or edict" is the only way to state a claim for municipal liability under *Monell*.[184] This is incorrect. Instead, as the Supreme Court held 35 years ago and has repeatedly affirmed in the years since, when a failure to train or supervise amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact," "such a shortcoming [can] properly be thought of as a [municipal] 'policy or custom' actionable under § 1983."[185]

Furthermore, although Penn State argues that it cannot be liable for a failure to train or supervise because such a failure is "gender-neutral,"[186] "[t]he pleading

---

[182] *Monell*, 436 U.S. at 690.

[183] Brief in Support, Doc. 10 at 20-21.

[184] *See Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019).

[185] *Canton*, 489 U.S. at 388-389, 392.

[186] Brief in Support, Doc. 10 at 21 ("Finally, even if these 'failures' to have a policy could somehow be deemed 'policies,' each one as alleged is gender-neutral."). The citation provided by Penn State references the Eastern District of Pennsylvania's analysis of the theory that a policy was facially unconstitutional, not that a lack of training, discipline or supervision evidenced deliberate indifference to the risk of future violations. *See Roe v. Pa. State Univ.*, No. 18-2142, 2019 U.S. Dist. LEXIS 24870, at *36 (E.D. Pa. Feb. 15, 2019) ("In support of her equal protection claim, Roe argues the Code of Conduct is not sex-neutral . . .

requirements are different for failure-to-train claims because a plaintiff need not allege an unconstitutional policy."[187] The municipal body's inaction gives rise to liability because its deliberate indifference to the known risk of future constitutional violations causes such violations to occur, not because the lack of training or supervision is facially unconstitutional.[188]

A Section 1983 plaintiff may plead that her constitutional injury was "caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice.'"[189] This avenue for *Monell* liability "arose in the failure-to-train context, but applies to other failures and inadequacies by municipalities, including those related to supervision and discipline by its police officers."[190] "This consists of showing as to whether (1) municipal policymakers know that employees will confront a particular situation,  (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."[191]

"'[D]eliberate indifference' is a stringent standard of fault."[192] "A pattern of similar constitutional violations" is ordinarily necessary "to demonstrate deliberate

---

Roe's argument fails because the Code of Conduct is clearly gender-neutral . . . none of the conduct is attributable to an *official policy* of Penn State.") (emphasis added).

[187] *Roman*, 914 F.3d at 798.
[188] *Id.*
[189] *Id.* at 798-99 (quoting *Brown v. Muhlenberg Twp.*, 269 F.3d 658, 694 (1978)).
[190] *Forrest v. Parry*, 930 F.3d 93, 105-106 (3d Cir. 2019).
[191] *Id.* at 106 (citing *Carter v. City of Phila.*, 181, F.3d 339, 357 (3d Cir. 1999)).
[192] *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997).

indifference for purposes of failure to train."[193] For a Section 1983 claim to survive

dismissal, it must be plausible that a policymaker with the authority to correct the

violations had notice of this pattern of similar violations.[194] However, "[t]he actual

knowledge requirement imposes a higher standard for Title IX claims than for

claims arising under § 1983, where deliberate indifference can follow actual or

constructive notice."[195] As this Court stated in *Moss*, the Section 1983 notice

"question is simply a broader framing of the inquiry that applies to  [] Title IX

claims. Instead of focusing only on whether [the harasser] presented a danger to

students, the standard is whether Penn State had knowledge of sexual harassment

by its employees generally."[196]

Because the complaint alleges that Penn State's Office of Ethics and

Compliance, Office of Sexual Misconduct and Prevention ("OSMP"), and

Affirmative Action Office were delegated Title IX enforcement responsibilities, it

is plausible that these Departments were policymakers with the authority to correct

Equal Protection violations premised on Bean's conduct.

The same facts supporting Penn State's actual knowledge of the danger of

harassment Bean posed to students, relating to W2's Title IX complaint and to the

---

[193] *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

[194] *See Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir. 1996) (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990)).

[195] *Doe v. Bradshaw*, 203 F.Supp. 3d 168, 185 (D. Mass. 2016) (citing *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 903 (1st Cir. 1988)).

[196] 2023 U.S. Dist. LEXIS 140979, at *22.

similar allegations by W1, W3 and W4, also support Penn State's notice of a pattern of similar violations. While Wassel's complaint does not state that W1, W3 or W4 filed complaints, their accounts do support a fair inference that the problems that led to Wassel's harassment "were occurring during the time of h[er] allegations and for some time before that."[197] In addition to these facts, the OCR Letter also shows on a broader level that Penn State had notice of its deficient response to allegations of sex-based harassment since at least 2020.[198]

Based on these allegations, it is plausible that Penn State policymakers had notice of unconstitutional sex-based harassment by Bean and within the University at large, was faced with history of mishandling by Bean and others at Penn State, and had notice that the sex-based harassment of Bean and others would frequently cause violations of the Equal Protection Clause. Penn State plausibly displayed deliberate indifference to these violations by failing to discipline Bean or implement additional training or supervision.

Penn State's deliberate indifference to Bean's harassment is on even firmer ground under *Monell* than it is under Title IX. Penn State's motion to dismiss Wassel's Equal Protection claim is denied.

---

[197] *Roman*, 914 F.3d at 799.

[198] *See Moss*, 2023 U.S. Dist. LEXIS 140979, at *23 (finding that the same OCR Letter supported Penn State's deliberate indifference to sexual harassment with respect to a different plaintiff); *Roman*, 914 F.3d at 798-99 (consent decree supported police department's notice of similar violations).

## IV.   CONCLUSION

Wassel has adequately alleged Penn State's liability for unlawful sex-based harassment in violation of Title IX and the Equal Protection Clause. Accordingly, Penn State's motion to dismiss is denied in full.

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge